AO 91 (Rev. 11/11) Criminal Complaint      AUSA Kathryn E. Malizia (312) 353-5319

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**
JUN 24 2019
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FERNANDO PEREZ-SOBERANIS | CASE NUMBER:<br>**UNDER SEAL**<br><br>19 CR 523<br><br>MAGISTRATE JUDGE KIM |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 8, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

*Code Section*

Title 21, United States Code, Section 846

*Offense Description*

conspiracy to possess with intent to distribute and to distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

_____
RYAN S. PARKER
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: June 21, 2019

_____
*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF ILLINOIS | ss

## AFFIDAVIT

I, RYAN S. PARKER, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since of July 2018. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that Fernando PEREZ-SOBERANIS violated Title 21, United States Code, Section 846. This complaint alleges that, between on or about January 31, 2018, and February 8, 2018, PEREZ-SOBERANIS, together with Individual A and an unidentified man known as "Gerardo," conspired to possess with intent to distribute and to distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21 United States Code, Section 846.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information provided to me by confidential sources, my review of undercover recordings, transcriptions/translations and surveillance footage, cell phone records, my training and experience and other evidence.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PEREZ-

SOBERANIS with conspiracy to possess with intent to distribute and to distribute one kilogram or more of heroin, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

I. FACTS SUPPORTING PROBABLE CAUSE

5. As discussed below, between on or about January 31, 2018, and February 8, 2018, a Mexico-based source of narcotics arranged for PEREZ-SOBERANIS and Individual A to distribute approximately 4.8 kilograms of heroin to a Confidential Source (CS) who, unbeknownst to them, was cooperating with law enforcement. On or about February 8, 2018, PEREZ-SOBERANIS transported more than four kilograms of heroin in a hidden compartment of a Nissan Xterra to the parking lot of a market in Chicago; agreed to loan the Nissan to the CS so that the CS could remove the heroin from the Nissan and replace it with cash to purchase the heroin; and explained in detail what the CS needed to do to open the hidden compartment in which the heroin was stored. Agents later seized approximately 4.8 kilograms of heroin (gross weight) from the Nissan's hidden compartment, which was located exactly where PEREZ-SOBERANIS said it would be.

6. Beginning on January 31, 2018, a Buffalo Grove Police Department Confidential Source (CS),[1] at the direction of investigating agents, participated in

---

[1] The CS pled guilty in the Northern District of Illinois as part of a largescale, ongoing cocaine trafficking investigation. The CS has been cooperating since approximately March 2017 in hopes of receiving a favorable sentencing recommendation from the U.S. Attorney's Office for

multiple consensually recorded telephone calls with a Mexico-based source of narcotics, known only as "Gerardo."[2] In these conversations, Gerardo agreed to sell the CS around four to five kilograms of heroin for around $45,000 to $46,000 per kilogram. Gerardo told the CS that Gerardo's associate in the Chicago area (later identified as PEREZ-SOBERANIS) would call the CS to arrange the transaction.

7. Beginning on or about February 5, 2018, the CS began receiving and having consensually recorded calls with Gerardo's Chicago-based associate, PEREZ-SOBERANIS, who was using telephone number (773) 383-6143 (hereafter, the "Target Phone").[3] In these calls, PEREZ-SOBERANIS agreed to sell the CS multiple kilograms of heroin.

---

the Northern District of Illinois. The information provided by the CS in this investigation has proved to be reliable and has been independently corroborated through consensual recordings and seizures of narcotics and narcotics and narcotics proceeds. Information he/she provided assisted investigating agents in the seizure of approximately $444,000 in narcotics proceeds in May 2017.

[2] All consensually recorded telephone and in-person conversations between the CS and GERARDO, and the CS and PEREZ-SOBERANIS are in Spanish. A Spanish-speaking Agent has listened to the recordings of the calls and they are consistent with information provided by the CS. The recorded conversations summarized herein include my own and fellow agents' understanding of what was being said, including the use of coded language. This understanding and interpretation of the conversations is based on (i) the content and context of the conversations, (ii) my experience and my fellow agents' experiences as law enforcement officers, including our experience observing written conversations as a whole, (iii) the investigation to date, and (iv) the CS's interpretation of the conversation. All transcriptions of recorded conversations are preliminary, draft translations from the Spanish language into the English language and are subject to revision.

[3] As explained herein, PEREZ-SOBERANIS was identified based on the CS's identification of a known driver's license photo of PEREZ-SOBERANIS, agent comparison of a law enforcement photograph of PEREZ-SOBERANIS to in-store surveillance video, and recorded calls in which PEREZ-SOBERANIS was identified as having the first name "Fernando." The user of the Target Phone was identified as PEREZ-SOBERANIS based on a comparison of audio recordings of the CS's subsequent in-person meeting with PEREZ-SOBERANIS and consensual recordings of the CS's conversations with the user of the Target Phone.

3

8. On February 8, 2018, at approximately 1:04 p.m., the CS had a consensually recorded call with PEREZ-SOBERANIS, who was using the Target Phone. During this call, PEREZ-SOBERANIS stated, "[T]hose dudes [Gerardo] told me it would be like five hours [five kilograms of heroin]. How long [many kilograms] are you going to need?" The CS responded, "Yeah, just like five hours [five kilograms]." PEREZ-SOBERANIS stated, "No, just like four and a half, no more [PEREZ-SOBERANIS only had 4.5 kilograms available to give to the CS]."

9. On February 8, 2018, at approximately 3:26 p.m., PEREZ-SOBERANIS, using the Target Phone, called the CS. During this call, PEREZ-SOBERANIS used coded language to advise the CS that he was ready to conduct a narcotics transaction near the intersection of Central Avenue and Diversey Avenue in Chicago for $46,000 per kilogram. Specifically:[4]

    a. PEREZ-SOBERANIS stated, "Uh, the check is for 4,600 to buy the car [coded language for $46,000 per kilogram of heroin]." CS asked, "Forty-six

---

[4] Some of the consensually recorded conversations ("recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and in central time, unless otherwise noted. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the CS, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation. Some of the recorded conversations contained herein are in the Spanish language. For these conversations, I have relied on draft – not final – English translations of conversations in Spanish done by DEA agents and/or interpreters contracted by DEA.

hundred?" PEREZ-SOBERANIS responded, "Yeah." CS asked, "How are we going to do it [complete the transaction]?" PEREZ-SOBERANIS stated, "You...You do your calculations and I'll lend you the... the... the... my car [PEREZ-SOBERANIS is going to allow the CS to take possession of a car containing the kilograms of narcotics]. . . . I'll bring it to you."

b. CS asked, "4,600, right [$46,000 per kilogram of heroin]?" PEREZ-SOBERANIS responded, "Uh-huh. And you do your calculation there. So you let me know what's adding up to, how much you deposited and everything [PEREZ-SOBERANIS is instructing the CS to leave the money to purchase the narcotics in the same car in which the heroin will be stored]." CS asked, "Ok. Uh, will you call me soon then, again or what?" PEREZ-SOBERANIS responded, "Yeah. I will... I... I'll ca... the... the... the... I'll see you at... at Central and... Central, there around Central and Diversey."

10. The Nissan Xterra arrived at the Fresh Market at approximately 3:51 p.m. Agents lost sight of the Nissan for approximately 20-30 seconds after it entered the parking lot. When agents regained surveillance, the Nissan was parked and unoccupied in the parking lot. Agents later reviewed surveillance footage from the Fresh Market, which depicted PEREZ-SOBERANIS getting out of the Nissan and entering the Fresh Market during the period that agents temporarily lost sight of the Nissan.

11. At approximately 3:56 p.m., PEREZ-SOBERANIS, who was using the Target Phone, called the CS. During this call, PEREZ-SOBERANIS told the CS that

5

he was at the Fresh Market on Central Avenue between Fullerton and Diversey and that he would wait to meet the CS at that location.

12. At approximately 4:33 p.m., agents observed the CS enter the Fresh Market where he met with PEREZ-SOBERANIS.[5] Prior to this meeting, agents outfitted the CS with a concealed audio and video recording equipment and an audio transmitter, and observed the CS travel to the meeting under surveillance. The meeting was also captured by a Fresh Market surveillance camera. During this approximately two minute long meeting, as captured by the CS's recording device:

    a. CS asked, "So what's it going to be? Tell me really quickly." PEREZ-SOBERANIS responded, "I'm going to put it right there for you. . . . Uh, that's why I told you [U/I] it's the Nissan. . . . The Nissan Xterra [the approximately four kilograms of heroin inside of the Nissan Xterra that PEREZ-SOBERANIS drove to the Fresh Market]." CS stated, "Uh-huh." PEREZ-SOBERANIS stated, "When you get in [the Nissan], you just lift up the sides. . . . Where you sit in the back, where the car jack is, that's the... that's the door [a hidden ("trap") compartment underneath the rear passenger seat containing the heroin]. . . . Towards the back. Underneath your steering wheel." CS stated, "Let's see, right here. Boom."

    b. PEREZ-SOBERANIS explained, "There are... there are two screws. . . . With a little cable, the [U/I] must be running." CS asked, "The ground?"

---

[5] As noted above, PEREZ-SOBERANIS was identified based the CS's identification of a known driver's license photo of PEREZ-SOBERANIS, prior recorded calls in which PEREZ-SOBERANIS was identified as having the first name "Fernando," and preliminary voice comparisons of the in-person meeting and consensual recordings with the Target Phone.

6

PEREZ-SOBERANIS responded, "Exactly." PEREZ-SOBERANIS continued, "[J]ust below the screws. . . . It connects both screws. . . . Yeah. It is the base underneath the steering wheel. . . . The steering wheel itself, not down by your feet. Where the steering wheel ends, there are two original screws. . . . You see a cable there, but the truck must be running. . . . And that's all [PEREZ-SOBERANIS is providing the CS detailed instructions on how to access the hidden compartment in the Nissan]."

    c.    CS asked, "What about the cards [the approximately four kilograms of heroin]?" PEREZ-SOBERANIS responded, "They are inside [the trap compartment]." CS asked, "But, where...? But I don't understand where they [the kilograms of heroin] are at." PEREZ-SOBERANIS stated, "OK. The seats in the back. . . you have to lift up just the part where you sit. . . . Not seat back. Both of them. . . . From there you'll see the car jack. . . . And that is the compartment [containing the heroin]. You'll pick it up. What it's going to do is that 'click-click' sound, it clicks, and you're going to pick that one up."

    d.    CS stated, "The thing is that my friend, my friend, the, the, the guy that was with me, dude, he got scared [of detection by law enforcement, knowing they were engaged in an illegal narcotics transaction], dude." PEREZ-SOBERANIS stated, "Oh." CS stated, "Imagine. Because I had not arrived yet. But the thing is that I don't know this area very well." PEREZ-SOBERANIS stated, "Yeah, yeah, yeah. I know."

    e.    PEREZ-SOBERANIS again stated, "[U/I] on your steering wheel there are two screws. . . . You click it first, with the truck on [to open the trap

7

compartment]. Lift the seats, the seats in the back. You lift both seats, and there is a jack in there, that one is the door [to the compartment where the heroin is stored]. And right there is the [U/I] inside there."

  f. CS stated, "Well. Just let me, I will be right back. Just let me make sure everything is good outside." PEREZ-SOBERANIS stated, "All right." CS stated, "I will be back really quick." PEREZ-SOBERANIS stated, "All right."

  13. At approximately 4:37 p.m., agents observed the CS exit the Fresh Market and meet with agents at a prearranged location. Agents subsequently directed the CS not to attempt to retrieve the narcotics from the Nissan that PEREZ-SOBERANIS had driven to the Fresh Market. The CS then left the area at the direction of investigating agents.

  14. At approximately 8:30 p.m., agents observed Individual A arrive at the Fresh Market parking lot in a red Hyundai Sonata, with Individual B in the passenger seat, and pull up alongside the Nissan. Individual A got into Nissan and drove out of the parking lot, with Individual B following him in the Sonata.

  15. At approximately 8:40 p.m., agents observed Individual A arrive in the Nissan at a residence located on the 7900 block of W. Birchdale in Elmwood Park, Illinois. After he parked and exited the vehicle, agents announced themselves as law enforcement officers and commanded Individual A to stay where he was and put his hands in the air. Individual A disregarded the agents, turned around and attempted to walk away. Individual A continued to disregard commands to stop and put his hands in the air. Agents briefly wrestled with Individual A to place him in handcuffs

as Individual A continued to resist. Individual A was placed into handcuffs at approximately 8:56 p.m.

16. Shortly after Individual A was placed in handcuffs, a Spanish-speaking Task Force Officer verbally advised Individual A of his *Miranda* rights. Individual A waived his rights under *Miranda* and agreed to speak with agents without the assistance of counsel. During this interview, Individual A advised that:

a. An individual he referred to as "Junior" told Individual A to pick up the Nisan from the Fresh Market lot. "Junior" told Individual A that he would arrange for the car to be picked up the following morning.

b. Individual A denied knowing there were narcotics in the Nissan.

17. Individual A also provided verbal and later written consent to search the Nissan. At approximately 9:45 p.m., a canine trained to detect the odor of narcotics performed an open-air sniff of the Nissan and alerted positive to the presence of narcotics inside. Upon searching the vehicle, agents located a concealed compartment underneath the rear passenger seat, in the same location where PEREZ-SOBERANIS had earlier told the CS that he/she would find it. Inside the concealed compartment, agents found 11 brick-shaped packages containing a powdery substance, which field-tested positive for the presence of heroin. The gross weight of the packages was approximately 4.80 kilograms. Agents released Individual A, and did not seek PEREZ-SOBERANIS's immediate arrest, so as to not compromise an ongoing investigation.

## CONCLUSION

18. Based on the foregoing, I respectfully submit that there is probable cause to believe that between on or about January 31, 2018, and February 8, 2018, PEREZ-SOBERANIS, together with others known and unknown, conspired to possess with intent to distribute and to distribute a controlled substance, namely, one kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21 United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

_____
RYAN S. PARKER
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on June 21, 2019.

_____
YOUNG B. KIM
United States Magistrate Judge

10